# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 23-1593V

|  |  |
|---|---|
| KASHAF ZAIDI, | Chief Special Master Corcoran |
| Petitioner, | Filed: August 28, 2025 |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*David R. Centracchio, Gordon & Centracchio, L.L.C., Chicago, IL, for Petitioner.*

*Benjamin Rex Eisenberg, U.S. Department of Justice, Washington, DC, for Respondent.*

## FINDINGS OF FACT[1]

On September 14, 2023, Kashaf Zaidi filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that that she suffered a shoulder injury related to vaccine administration ("SIRVA") caused by an influenza ("flu") vaccine received on October 12, 2020. Petition at 1-4. The case was assigned to the Special Processing Unit of the Office of Special Masters.

---

[1] Because this Fact Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Fact Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

For the reasons discussed below, I find that, more likely than not, Petitioner suffered the residual effects of her condition for more than six months, and that the onset of her shoulder pain likely began within 48 hours of vaccination. But other fact questions relating to the claim remain unresolved.

## I.    Procedural History

In his Rule 4 Report, Respondent objected to compensation on three grounds (ECF No. 18). First, Respondent argued that Petitioner had not established that she experienced residual effects for more than six months, noting that she treated her injury for just under four months, at which point her shoulder was about 80% normal. Rule 4 Report at 5-7. During an annual physical four months later, she had a normal examination and reported no musculoskeletal problems. *Id*.

Respondent also asserted that Petitioner had not shown that the onset of her pain began within 48 hours, noting that she did not seek care until 70 days after vaccination, at which point she vaguely complained of pain "following" vaccination. Rule 4 Report at 7-8. Respondent's final objection concerns whether that Petitioner has established that she experienced reduced range of motion ("ROM") in her left shoulder. *Id*. at 8-9.

Following a telephonic status conference, Petitioner filed additional evidence (ECF Nos. 19, 22, 23). Thereafter, Respondent filed a status report confirming that he had reviewed the additional evidence and maintaining his position that this case is not appropriate for compensation (ECF No. 25).

## II.    Factual Finding

### A.  Legal Standard

Before compensation can be awarded under the Vaccine Act, a petitioner must preponderantly demonstrate all matters required under Section 11(c)(1), including the factual circumstances surrounding his or her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are

also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

In addition to requirements concerning the vaccination received and the lack of other award or settlement,[3] a petitioner must establish that he or she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he or she received. Section 11(c)(1)(C). The Vaccine Act further includes a "severity requirement," pursuant to which a petitioner demonstrate that they "suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine . . . ." Section 11(c)(1)(D).

"[T]he fact that a Petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) ("a discharge from medical care does not necessarily indicate there are no residual effects"). "A treatment gap . . .  does not automatically mean severity cannot be established." *Law v. Sec'y of Health & Human Servs.*, No. 21-0699V, 2023 WL 2641502, at *5 (Fed. Cl. Spec. Mstr. Feb. 23, 2023) (finding severity requirement met where Petitioner sought care for under three months and had met physical therapy goals but still lacked full range of motion and experienced difficulty with certain activities, then returned to care nearly five months later reporting stiffness and continuing restrictions in motion); *see also Peeples v. Sec'y of Health & Human Servs.*, No. 20-0634V, 2022 WL 2387749 (Fed. Cl. Spec. Mstr. May 26, 2022) (finding severity requirement met where Petitioner sought care for four months, followed by fifteen-month gap); *Silvestri v. Sec'y of Health & Human Servs.*, No. 19-

---

[3] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception and has not filed a civil suit or collected an award or settlement for his or her injury. Section 11(c)(1)(A)(B)(E).

3

1045V, 2021 WL 4205313 (Fed. Cl. Spec. Mstr. Aug. 16, 2021) (finding severity requirement satisfied where Petitioner did not seek additional treatment after the five-month mark).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time-frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly

4

recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

### B. Medical Records

Petitioner received the vaccine alleged as causal on October 12, 2020. Ex. 3 at 1. Just over two months later, on December 21, 2020, Petitioner saw orthopedist Dr. Joshua Alpert complaining of "pain in her left shoulder following her flu shot on 10/12/2020." Ex. 5 at 12. She stated that the vaccine had been injected more proximal than usual, and rated her pain level as three out of ten. *Id*. The pain had improved slightly since October but remained. *Id*. The record lists the date of injury as October 12, 2020. *Id*.

On examination, Petitioner's ROM on passive and active forward elevation was normal at 180 degrees. Ex. 5 at 12. Her active ROM in external rotation with her arm at her side was 70 degrees, while her active and passive ROM in external rotation with 160 degrees of abduction was 160 degrees. *Id*. at 12-13. She did not have pain with ROM. *Id*. at 13. Dr. Alpert assessed her with left shoulder pain, and ordered an MRI. On a medical history form, Petitioner listed the date of injury or onset of symptoms as October 12, 2020, stating that it resulted from a flu vaccine. *Id*. at 5.

A left shoulder MRI performed on January 5, 2021, showed a partial tear of the supraspinatus tendon and prominent bone marrow edema. Ex. 5 at 14. Petitioner returned to Dr. Alpert on January 11, 2021, to review the MRI. *Id*. at 10. She stated she had received a flu vaccine in October, and "since then, she has had pain and weakness in her arm." *Id*. On examination, she could fully flex and extend her left shoulder. *Id*. She had slightly reduced strength. Her MRI showed a partial thickness tear and significant bone marrow edema. *Id*. He stated that this was "all consistent with a partial rotator cuff tear that likely occurred after a flu shot." *Id*. He provided oral steroids and home exercises, stating that if this did not help, she may need a cortisone injection. *Id*.

Petitioner followed up with Dr. Alpert the following month, on February 8, 2021 – nearly four months after vaccination. Ex. 5 at 8. Her shoulder was much better and "she was feeling great for a while, but now some of her pain is coming back." *Id*. She described her shoulder as "about 80% of normal." *Id*. On examination, she could fully flex and extend her left shoulder, and had full rotator cuff strength, with some mild pain. *Id*. They discussed treatment options such as formal physical therapy, a cortisone injection, anti-inflammatory medications, and surgical intervention. *Id*. Petitioner was directed to continue her home exercises and return if needed. *Id*.

On June 3, 2021, now almost eight months after vaccination, Petitioner saw Dr. Shazia Daudi for an annual physical examination. Ex. 4 at 16. She denied joint pain and

weakness, and no musculoskeletal abnormalities were noted on examination. *Id*. at 16-17. The record does not mention any problems with Petitioner's shoulder.

### C. Testimonial Evidence

Petitioner's treating orthopedist, Dr. Alpert, submitted an affidavit on her behalf. Ex. 7. Dr. Alpert states that he saw Petitioner three times between December 2020 and February 2021. *Id*. at ¶ 2. At the first appointment, she complained of left shoulder pain following an October 12, 2020 vaccination, and documented on a medical history form that her symptoms began on October 12, 2020. *Id*. at ¶ 3. He adds:

> On December 21, 2020 I performed an examination upon her. The examination included the following abnormal range of motion exams:
>
>   a. Range of motion on passive external rotation with arm at the side is 70 degrees.
>   b. Range of motion on active external rotation with arm at the side is 70 degrees.

Ex. 7 at ¶ 4.

Dr. Alpert states that it is his opinion "based upon a reasonable degree of medical and orthopedic certainty that Ms. Zaidi suffered from a left partial thickness rotator cuff tear due to the October 12, 2020, flu vaccination shot." Ex. 7 at ¶ 9.[4] He adds that in his opinion, her rotator cuff tear is "permanent in nature unless there is future surgical repair." *Id*. at ¶ 10. She "will likely continue to experience pain and associated weakness when performing any overhead lifting activities as a result of the partial tear." *Id*.

Petitioner submitted a declaration on her own behalf. Ex. 8.[5] She states that she felt "immediate pain" in her left arm after vaccination. *Id*. at ¶ 4. That evening, she was unable to lift objects such as a light blanket with her left arm. *Id*. Since her February 2021 appointment with Dr. Alpert, she "continue[s] to experience intermittent pain and weakness which randomly presents and persists for varying amounts of time." *Id*. at ¶ 7. She has not sought additional medical treatment because it is her understanding that she has a partially torn rotator cuff that will cause intermittent symptoms. *Id*. at ¶ 8.

---

[4] I note that, Dr. Alpert's contentions aside, it is not credible under existing Vaccine program case law that a rotator cuff tear could ever be *caused* by a SIRVA. Rather, it is often the case that subclinical shoulder issues are observed on imaging *after* the occurrence of a SIRVA. But this allegation does not impact my fact findings.

[5] Although Petitioner labeled this filing an affidavit, it is not notarized. Nonetheless, it is acceptable as a declaration. 28 U.S.C. § 1746.

### D. Finding of Fact

#### 1. Severity

Petitioner's last treatment for her shoulder injury occurred four months after the onset of her symptoms, at which point she described her shoulder as "about 80% of normal." Ex. 5 at 8. Her pain had improved with oral steroids, but was returning at the time of her last appointment. Her ROM and strength were normal, with mild pain. Thus, at this time, she had significant improvement, but still had some pain. Less than four months later, she underwent a routine physical examination, at which time no shoulder concerns were documented – suggesting that her condition had now resolved. Ex. 4 at 16.

This sequence of events raises a question: did her shoulder pain continue until early to mid-April 2021 – the six-month mark – or resolve before then? In early February, four months after vaccination, Petitioner's shoulder was "about 80% of normal." Ex. 5 at 8. Although oral steroids had helped, her pain at this time was *returning*. And Petitioner testified that she continues to have intermittent pain and weakness. Ex. 8 at ¶ 7.

Together, these records lead to the conclusion that, more likely than not, Petitioner's shoulder pain continued at least until mid-April 2021, sufficient to meet the statutory severity requirement. However, the SIRVA likely resolved soon thereafter, given that she did not complain of any shoulder concerns by early June 2021. (This will be relevant to damages, assuming Petitioner can resolve other existing fact disputes).

#### 2. Onset

I find that, more likely than not, Petitioner's shoulder pain began within 48 hours of vaccination. Although she did not seek care for just over two months, this pattern is seen in SIRVA cases with some frequency, and does not defeat a claim. *Baskin v. Sec'y of Health & Human Servs.*, No. 21-2207V, 2025 WL 1891826, at *7 (Fed. Cl. Spec. Mstr. June 2, 2025) ("treatment delay by itself does not undermine a favorable onset finding"); *Graczyk v. Sec'y of Health & Human Servs.*, No. 21-0376V, 2023 WL 4573868 (Fed. Cl. Spec. Mstr. June 16, 2023) (finding onset within 48 hours where Petitioner first sought care two months after vaccination).

When Petitioner first sought care, she related her pain to vaccination, and listed an onset date of October 12th – the date of vaccination. Ex. 5 at 5, 12. At the January 2021 appointment, she complained of pain "since" vaccination. *Id*. at 14. And she has testified that her pain began immediately after vaccination, resulting in her being unable to use her left arm to lift objects that evening. Ex. 8 at ¶ 4.

#### 3. Reduced ROM

Respondent notes that Dr. Alpert found Petitioner's external rotation to be 70 degrees at the December 21, 2020 appointment. Rule 4 Report at *8. Respondent adds

7

that Dr. Alpert documented other ROM test results that "are not standard range of motion tests, and they are difficult to interpret [but] appear to show results within a normal range of motion."[6] *Id*. at *8-9.

Although Respondent focuses on the "non-standard" ROM tests, the record also documents active and passive ROM of 70 degrees in external rotation with her arm at her side, which Dr. Alpert describes as "abnormal." Ex. 7 at ¶ 4. As such, it appears that Petitioner has provided some evidence suggesting a reduction in ROM, although I defer ruling on this matter at this time.[7]

### III.    Scheduling Order

- **Respondent shall file, by no later than <u>Monday, September 29, 2025</u>, a status report indicating whether, in light of my ruling herein, he is willing to engage in tentative discussions regarding settlement or proffer or remains opposed to negotiating. If Respondent wishes to file an amended Rule 4 Report, he may propose a due date for it.**

   **IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master

---

[6] The record states:

> Range of motion on passive external rotation with 90 degree abduction is 160 degrees.
> Range of motion on active external rotation with 90 degree abduction is 160 degrees.
> Range of motion on passive external rotation with 160 degree abduction is 160 degrees.
> Range of motion on active external rotation with 160 degree abduction is 160 degrees.

Ex. 5 at 13.

[7] If Petitioner were found not to have established reduced ROM, an off-Table claim could be viable. *See Bolick v. Sec'y of Health & Human Servs*., 20-893V, 2023 WL 8187307, at *8-9 (Fed. Cl. Spec. Mstr. Oct. 19, 2023) (dismissing Table SIRVA claim for failure to establish limited ROM, but reassigning case for consideration of off-Table claim).